# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**EVELYN R. ESTRADA,**

        Plaintiff,

vs.                                           No. CIV 01-1078 WJ/LCS

**JO ANNE B. BARNHART,**[1]
**Commissioner,**
**Social Security Administration,**

        Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

THIS MATTER came before the Court upon Plaintiff's Motion to Reverse or Remand the Administrative Decision filed January 31, 2002 (*Doc. 10*). The Commissioner of the Social Security Administration issued a final decision denying the Plaintiff her claim for a period of disability and/or disability insurance benefits. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is not well-taken and recommends that it be DENIED.

## PROPOSED FINDINGS

## I. PROCEDURAL RECORD

1.        Plaintiff Evelyn Estrada filed an application for a period of disability and/or disability

---

[1] Effective November 14, 2001, Jo Anne B. Barnhart was appointed to serve as Commissioner of the Social Security Administration. Pursuant to FED. R. CIV. P. 25 (d), Jo Anne B. Barnhart, Commissioner of the Social Security Administration, is substituted for Larry G. Massanari, Acting Commissioner of the Social Security Administration, as the defendant in this action.

insurance benefits with the Social Security Administration on February 4, 2000 alleging a disability since March 2, 1999 due to diabetes. *See* R. at 57. At the time of her application, the Plaintiff was 24 years of age. *See* R. at 57. The Plaintiff's application was denied at the initial level on February 10, 2000, *see* R. at 45, and at the reconsideration level on June 22, 2000, *see* R. at 44. Plaintiff appealed the denial of her claim by filing a Request for Hearing by Administrative Law Judge on July 19, 2000. *See* R. at 54.

2. The Commissioner's ALJ conducted a hearing on Ms. Estrada's application on February 5, 2001. *See* R. at 10. The ALJ made the following conclusions according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993): the claimant had not engaged in substantial gainful activity since March 2, 1999; the severity of the claimant's impairments did not meet or equal a listed impairment; the claimant had a "severe" impairment or combination of impairments due to her diabetes; the claimant's subjective complaints and functional limitations, including pain were not supported by the evidence as a whole in the disabling degree alleged and therefore lacked credibility; and the claimant had a residual functional capacity for at least a wide range of light work which included work activities related to her past relevant work. *See* R. at 10-14.

3. The ALJ entered his decision February 20, 2001. *See* R. at 10-14. Thereafter, the Plaintiff filed a request for review in March of 2001 to the Appeals Council. *See* R. at 6. On July 13, 2001, the Appeals Council issued its decision denying her request for review and upholding the final decision of the ALJ. *See* R. at 4. The Plaintiff subsequently filed her complaint for court review of the ALJ's decision on September 18, 2001. (*Doc. 1*).

## II. STANDARD OF REVIEW

4. The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F.2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (citation omitted)). A decision of an ALJ is not supported by substantial evidence if other evidence on the record overwhelms the evidence supporting the decision. *See Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

5. In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *Thompson*, 987 F.2d at 1486. The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. *See* 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *See Thompson*, 987 F.2d at 1487.

6. At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the

Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *See id.*

### III. ADMINISTRATIVE RECORD

7. The record indicates that Ms. Estrada has a history of type 1 diabetes dating back to the age of seven. *See* R. at 223. In November of 1995, the Plaintiff was hospitalized with "severe hypoglycemic/insulin reaction, viral gastroenteritis with vomiting and mild dehydration and sinusitis with probable strep pharyngitis." *See* R. at 240. When Ms. Estrada was first admitted, she experienced lethargic and withdrawn symptoms along with epigastric discomfort, cramps and vomiting. However, she improved with fluid replacement and blood sugar follow-ups. *See id.*

8. Approximately one year later, the Plaintiff was hospitalized again for "diabetic ketoacidosis[2] secondary to noncompliance." *See* R. at 235. She complained of confusion, fatigue and vomiting and stated that she forgot to take her insulin that morning. *See id.* The physician on call, Stephanie Grossman, M.D., admitted her and started her on an insulin drip. The doctor noted that her sugars responded very quickly and that she was "100% better than yesterday." *See id.* Before being discharged, the Plaintiff agreed to carefully watch her sugars, checking her glucose every four hours. *See id.* In August of 1997, Ms. Estrada was again admitted to the hospital for "diabetic ketoacidosis secondary to noncompliance based on indigence." *See* R. at 233. She complained of a headache, dehydration, palpitations, and anxiety. She remained on an insulin drip for approximately two days alleviating her headache and nausea. On the third day, she was discharged. *See id.*

9. In February of 1999, Ms. Estrada visited the Health Centers of Northern New

---

[2] Ketoacidosis is a condition normally found in diabetics which is an acidosis caused by the enhanced production of ketone bodies. *See* STEDMAN'S MEDICAL DICTIONARY 917 (26th ed. 1995).

4

Mexico in order to receive a follow-up on her urinalysis. *See* R. at 199. She was seen by Anthony Duran, PA-C. During her visit, she acknowledged that she has "poor compliance with follow-ups" and that "she is frustrated and does not want to come in to be seen because she 'gets lectures.'" *See id*. Five months later, Ms. Estrada was brought to the hospital completely unresponsive. *See* R. at 226. Her family stated that in the morning, she was disoriented. They checked her glucose level and subsequently administered glucose tablets. However, because she remained disoriented and unresponsive, she was admitted into the hospital. Julie Brady, M.D. assessed the Plaintiff and noted that it appeared her diet was normal and she was taking her medications regularly. *See id*. However, after being discharged, one of the hospital physicians, David Stoltze, M.D., noted that "[s]he had apparently been taking a regimen of . . . . insulin with regular insulin before meals, but not doing regular blood sugar checks before each meal." *See* R. at 226.

10. There are multiple occasions within the record where the Plaintiff's physicians counsel her on her need to eat regularly and to take her shots before every meal. *See* R. at 163, 165, 167, 223-24, 235, and 237. Specifically, on February 2, 2000, Dr. Stoltze stated that "this patient obviously needs more involvement in her own care." *See* R. at 224. He also stated that "[s]he recently begun more intensive diabetic health education with the intention of participating more actively in her care. However, for about the last month, she has had polyuria,[3] polydipsia,[4] and polyphagia."[5] *See* R. at 223. Dr. Stoltze subsequently noted that Ms. Estrada is believed to be "completely disabled pending better control of her diabetes." *See* R. at 201.

---

[3] Excessive excretion of urine resulting in profuse micturition (the desire to urinate). *See* STEDMAN'S MEDICAL DICTIONARY 1408 (26th ed. 1995).
[4] Excessive thirst that is relatively prolonged. *See* STEDMAN'S MEDICAL DICTIONARY 1402 (26th ed. 1995).
[5] Excessive eating; gluttony. *See* STEDMAN'S MEDICAL DICTIONARY 1407 (26th ed. 1995).

11. On February 28, 2000, Dr. Brady noted that there "seems to be no consistency in her blood sugars. . . . The patient states, otherwise, that she just needs some more refills in terms of her triamcinolone for her rash, and that her headaches and nausea have gotten better, although not completely cleared. " *See* R. at 160. Dr. Brady also noted that she counseled the Plaintiff about her blood sugars and consistency between meals. She stated that Ms. Estrada "needs to adhere to her diet a little better so we can have some consistency in what her blood sugars are going . . . . If she notices her p.m. sugars are running 250 or higher x three days, then she needs to increase her a.m. sugar to 16 units subcutaneously. This was written and explained twice to the patient. . . . The patient seems to be improving. I think once we get her blood sugars under better control, she should be doing well." *See* R. at 160.

12. Lastly, a couple of months later, the Plaintiff was admitted to the hospital "for control of her diabetes as well as workup for/and organ damage." *See* R. at 208. During her hospitalization, the treating physician noted that Ms. Estrada presented positive signs of end organ damage in both her kidneys, nephropathy[6], and retinopathy[7] in her eyes. *See* R. at 209.

13. The following summary represents questions that were asked by the ALJ at Ms. Estrada's hearing on February 5, 2001. The Plaintiff testified that she used to work for Alternative Home Health and performed such duties as bathing, changing and feeding developmentally disabled individuals. *See* R. at 28. She stopped working in February, 2000 due to her diabetes, a developing cateract, migraines, and nausea. *See* R. at 29-30. She stated the only medication she takes for her migraines is Tylenol. *See* R. at 30. Ms. Estrada testified that there are times when her sugar levels are

---

[6] Any disease of the kidney. *See* STEDMAN'S MEDICAL DICTIONARY 1184 (26th ed. 1995).
[7] Noninflammatory degenerative disease of the retina. *See* STEDMAN'S MEDICAL DICTIONARY 1539 (26th ed. 1995).

so low that she gets disoriented and her speech becomes slurred and her vision blurring. *See* R. at 31-32. Although the record indicates noncompliance with her medication, the Plaintiff testified that she believes her noncompliance is due to the fact she did not have enough income to buy insulin. *See* R. at 32. Ms. Estrada stated that she checks her sugar level three times a day before meals. *See* R. at 36. With respect to her vision, the Plaintiff testified that she has diabetic retinopathy in both eyes. *See* R. at 34. She says that she received two surgeries in each eye and that it remains to interfere with her ability to see. *See* R. at 34. Throughout the testimony, the Plaintiff stated that her activities include shopping, walking around the store once or twice before resting, taking care of her house and going to church once a week. *See* R. at 36 and 37.

## IV. DISCUSSION

14. The Plaintiff raises two arguments in support of her Motion to Reverse or Remand the Administrative Agency Decision. First, Ms. Estrada argues that the ALJ erred in his assessment that her diabetes was uncontrolled due to her noncompliance. And second, the ALJ incorrectly assessed that she could perform her past work.

### Noncompliance?

15. The Plaintiff claims the ALJ erred in his assessment that her diabetes was uncontrolled due to her noncompliance. First, the Plaintiff argues that the ALJ disregarded physicians' reports from April, 2000, that the Plaintiff had end organ damage to both kidneys, nephropathy, and retinopathy, and from February, 2000, that she is disabled due to her condition. Despite this argument, the ALJ is entitled to reject opinions of treating physicians where they are not supported by specific findings, or when they are unsupported by or inconsistent with other objective evidence of record. *See*

*Castellano v. Sec. of Health & Hum. Serv.*, 26 F. 3d 1027, 1029 (10th Cir. 1994); *see also Hamilton v. Sec. of Health & Hum. Serv.*, 961 F. 2d 1495, 1498 (10th Cir. 1992).

  16. With respect to the February, 2000 opinion, the ALJ stated

> [i]n August 1997 she experienced a bout of diabetic ketoacidosis also secondary to non-compliance (Exhibit 5F13). In June 1999 it was noted that she had not been monitoring her blood sugars (Exhibit 1F56). In February 1999 she acknowledged poor compliance with follow-ups (Exhibit 1F58). She began monitoring her sugars and it was not until October until she was briefly hospitalized after experiencing another medication and diet counseling. . . . Ms. Estrada was counseled to be more cautious about her sugar levels and that she needed to take more involvement in her own care. (Exhibit 5F4). *See* R. at 12.

The ALJ further noted that he could not "reconcile with the objective evidence D. Stoltz, M.D.'s February 2000 opinion that Ms. Estrada is disabled due to her condition." *See* R. at 12. As stated above, the ALJ made this conclusion after cataloging multiple entries in the medical record of various remarks concerning the Plaintiff's need to become more involved in her own care.

  17. The ALJ was correct in finding that he could not reconcile Dr. Stoltz' opinion that the Plaintiff is disabled with other objective evidence in the medical record. However, when reviewing Dr. Stoltz' medical opinion <u>in its entirety</u>, I find the doctor's assessment of the Plaintiff's condition is analogous to various other medical opinions in the record. Dr. Stoltz' unabridged opinion was that he believed Ms. Estrada to be "completely disabled *pending better control of her diabetes*." *See* R. at 201 (emphasis added). He further stated within his notes that "she eventually needs much more aggressive education and follow-up. . . . [and that] for about the last month, she has had polyuria, polydipsia, and polyphagia." *See* R. at 222-23.

  18. There are multiple references and opinions within the record that coincide with Dr. Stoltz' opinion, that the Plaintiff is noncompliant and sometimes defiant with respect to her treatment. *See* R. at 163, 165, 167, 235, 237, and 223-24. Specifically, the Plaintiff stated to one of her doctors

that she has "poor compliance with follow-ups" and that "she is frustrated and does not want to come in to be seen because she 'gets lectures.'" *See* R. at 199. In light of this overwhelming evidence, the ALJ's finding that he could not reconcile Dr. Stoltz' opinion, that Ms. Estrada is disabled due to her condition, is well supported.

19. With respect to the April, 2000 opinion regarding the Plaintiff's end organ damage to both kidneys, nephropathy, and retinopathy, I find the ALJ properly disregarded this opinion as well. The ALJ stated that "Ms Estrada's diabetes has imposed some kidney problems manifested by albuminuria and she has also developed retinopathy (Exhibit 4F4). However, neither condition has imposed more than negligible functional limitations" *See* R. at 12. After reviewing the complete record, I must agree with the ALJ. There is nothing in the record to suggest the Plaintiff's kidney problems pose a functional limitation. Furthermore, none of the Plaintiff's treating physicians refer to end organ damage and/or kidney failure. The physician who furnished the April, 2000 opinion treated the Plaintiff only once and did not offer specific findings regarding her kidney complications. *See Henderson v. Sullivan*, 930 F. 2d 19, 20 (8th Cir. 1991) ("the report of a consulting physician who examined the claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the claimant's treating physician."); and *Frey v. Bowen*, 816 F. 2d 508, 513 (10th Cir. 1987) (opinion properly rejected if it is brief, conclusory, and unsupported by medical evidence). Therefore, I find the ALJ accurately disregarded the April, 2000 opinion.

20. The Plaintiff next argues that her retinopathy and kidney problems were not evidence of intentional noncompliance. The ALJ stated that

> Ms. Estrada's diabetes has imposed some kidney problems manifested by albuminuria and she has also developed retinopathy (Exhibit 4F4). However, neither condition has imposed more than negligible functional limitations. Vision testing has disclosed that has visual acuity degradation amounting to 20/100 with a pinhole in her right eye and

20/30 in her left and she has developed cataracts (Exhibit 4F6). These findings are not seen to impose limitations excluding her from the entire occupational base. Further, they are relatively correctable conditions she has undergone corrective interventions in both eyes. *See* R. at 12-13.

21. As stated above, I find the ALJ properly assessed the affect of the Plaintiff's kidney problems on her ability to work. *See supra* ¶ 19. In addition, I find the ALJ properly examined the Plaintiff's visual limitations. The Listings state that in order to be disabling under Listing 2.02, impairment of central visual acuity, a claimant's corrected visual acuity must be 20/200 or worse. In this case, the Plaintiff's eye examination from April, 2000 showed that her visual acuity was 20/100 and 20/30. *See* R. at 211. Therefore, I find the ALJ properly examined the record in its entirety and appropriately considered the Plaintiff's lack of compliance in discounting the severity of her impairment.

## Past Relevant Work

22. The Plaintiff claims that the ALJ erred in determining she could return to her past relevant work as either a cashier or assistant store manager. Step four of the sequential analysis is comprised of three phases. *See Winfrey v. Chater*, 92 F. 3d 1017, 1023 (10th Cir. 1996). In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity. *See id.* (citing *Henrie v. U. S. Dept of Health & Human Servs.*, 13 F. 3d 359, 361 (10th Cir. 1993 )). In the second phase, the ALJ must determine the physical and mental demands of the claimant's past relevant work. *See id.* In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. *See id.*

23. In this case, the ALJ properly performed the step four analysis.[8] First, the ALJ found that the Plaintiff retained the residual functional capacity for at least a wide range of light work. *See* R. at 13. In the second phase, the ALJ determined that Ms. Estrada's past relevant work included employment as a cashier and assistant store manager, neither of which are performed at an exertional level greater than "light." *Id*. At the third phase, the ALJ concluded that although "she is unable to engage in occupations that require precise visual acuity such as might be expected in jobs such as electronic assembly . . . . [h]er vision problems do not adversely affect her ability to conduct activities such as shopping." *See id*. As stated above, such a conclusion is supported by the Plaintiff's April, 2000 eye examination. *See supra* ¶ 21. The ALJ further added that the Plaintiff "can walk normally and that fatigue is not a problem . . . [and that] her activities of daily living are intact and she performs effective child-care activities." *See id*. These findings are based on the daily activities questionnaire which were filled out by the Plaintiff personally. *See* R. at 129. Therefore, after reviewing the ALJ's findings and the record, I find that substantial evidence supports the ALJ's step four determination.

## RECOMMENDED DISPOSITION

The ALJ did apply the correct legal standards and his decision is supported by substantial evidence. I recommend that the Plaintiff's Motion to Reverse and Remand Administrative Decision, filed January 31, 2002 (*Doc. 10*), should be **DENIED**. Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to §636(b)(1)(C), file written objections to such proposed findings and recommendations with the Clerk of the United States

---

[8] There has never been any allegation by the Plaintiff during the administrative level or in this complaint that she suffers from a mental functional limitation.

District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**